**TWO THIRTY NINE JOINT VENTURE, Appellant,**

v.

**Harry J. JOE, Individually, and Jenkens & Gilchrist, A Professional Corporation, Appellees.**

No. 05–98–01775–CV.

Court of Appeals of Texas, Dallas.

Nov. 20, 2001.

Donald E. Godwin, David Patterson, Boyd A. Mouse, Godwin, White & Gruber, P.C., Dallas, for Appellant.

B. Prater Monning, III, Monning & Wynne, L.L.P., Dallas, Michael P. Lynn, John T. Cox, Lynn Stodghill Melsheimer & Tillotson, L.L.P., Dallas, for Appellee.

Before Justices FITZGERALD, RICHTER, and ROSENBERG.[1]

## OPINION

BARBARA ROSENBERG, Justice (Assigned).

Two Thirty Nine Joint Venture (239 JV) brought suit for malpractice and breach of fiduciary duty and duty of loyalty against Harry J. Joe, individually, and his law firm, Jenkens & Gilchrist, P.C. (J & G). The basis of the suit was that Joe and J & G breached their duty of loyalty to 239 JV when neither Joe nor the law firm disclosed that Joe, as a member of the Irving City Council, would or could take positions that would affect the real estate transactions in which J & G represented 239 JV. Joe filed a motion for summary judgment based on official immunity, which the trial court granted. Then, J & G filed a motion for summary judgment based on Joe's immunity, whether 239 JV had produced evidence to support each element of a malpractice claim, and other grounds. The trial court granted J & G's motion. In three points of error, 239 JV challenges the summary judgments, asserting (1) the trial court abused its discretion in failing to grant a motion for continuance when that motion was filed and heard within three months of the suit's filing; (2) Joe's summary judgment was improper because fact issues exist as to Joe's official immunity; and (3) J & G's summary judgment was erroneously granted. Because we conclude that the trial court abused its discretion in failing to grant a motion for continuance on Joe's motion for summary judgment, we reverse and remand the cause of action against Joe. Because we conclude that an attorney's duty of care includes disclosure of any conflict of interest that may affect the attorney's representation of that client's interest and that neither legislative nor official immunity protects an attorney from that private duty, we reverse and remand the summary judgment in favor of J & G.

## FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 1992, J & G attorneys represented 239 JV in its formation and business activities of acquiring, developing, and selling 239 acres located in Valley Ranch, a master-planned community located in Irving, Texas. By August 1994, 239 JV had sold all but an eleven-acre apartment tract. On August 18, 1994, 239 JV entered into a contract for the sale of that acreage. The contract was reviewed by William Thau, a J & G shareholder, and he provided legal advice to 239 JV on the sale of this acre-

---

1. The Honorable Barbara Rosenberg, Former Justice, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

age. The contract provided a review period ending September 17, 1994.

On September 4, 1994, the Sunday before Labor Day, the Irving City Council posted a three-day notice of a special meeting at which the council would consider an ordinance that would place a moratorium on apartment development. On September 7, at the special council meeting, Joe, a member of the Irving City Council and a partner in J & G, made the motion to adopt the moratorium, and the council passed the ordinance unanimously. On or about that same date, because of the City of Irving's moratorium on the building of apartments, the purchasers rejected the contract for sale of the eleven-acre apartment tract.

After learning that Joe was a member of J & G, members of 239 JV met with Joe. Joe was told of J & G's representation of 239 JV for the sale of the apartment property. The 239 JV members urged Joe to support the interests of the venture, and, if he could not, they asked him to declare a conflict of interest and withdraw from any further leadership role, discussion, or vote on the moratorium. Subsequently, on December 15, 1994 and May 18, 1995, Joe

voted twice to extend the moratorium. On June 22, 1995, when 239 JV requested a waiver of the moratorium, Joe abstained from the council vote.

On April 18, 1997, 239 JV filed suit against Joe and J & G. On May 12, 1997, they answered. On June 12, 1997, Joe filed his motion for summary judgment based on immunity. 239 JV filed a motion for continuance for time to obtain discovery for purposes of the summary judgment issues. The trial court denied the motion for continuance and granted Joe's motion for summary judgment.

After discovery, J & G filed a motion for summary judgment on six independent grounds. The trial court granted J & G's motion without stating the grounds. This appeal followed.

## THE MOTION FOR CONTINUANCE

 In 239 JV's first point of error, it complains that the trial court abused its discretion in denying 239 JV's first motion for continuance of Joe's summary judgment. Joe responds that no discovery is necessary to determine the official immunity defense that is the basis of his motion for summary judgment.[2]

---

**2.** Joe claims in another portion of his brief that his motion also encompassed legislative immunity. Legislative immunity protects only those duties that are functionally legislative. *Bowles v. Clipp*, 920 S.W.2d 752, 758 (Tex.App.—Dallas 1996, writ denied). A legislative act of establishing a policy, act, or law is protected under legislative immunity, while a nonlegislative act of enforcing or administering that policy, act, or law is not. *Id.* Joe pleaded that

The Affidavit of Harry Joe establishes on the occasions in question he was performing his discretionary duties as Irving City Councilperson and Mayor Pro Tem, in good faith, and was acting within his authority as City Councilperson and Mayor Pro Tem. Joe is, therefore, immune from suit.

Official immunity includes both legislative and administrative duties of an officeholder.

Joe's motion and his supporting affidavit do not allege that Joe was performing a policy-making function. No distinction is made for the elements necessary to prove legislative immunity. *See Bartlett v. Cinemark USA, Inc.*, 908 S.W.2d 229, 234–35 (Tex.App.—Dallas 1995, no writ) (adopting "legislative facts" and "particularity of impact" tests for determining entitlement to legislative immunity). Therefore, because of the specificity of the official immunity pleading and the lack of any pleaded elements of legislative immunity, we conclude that Joe's motion did not assert legislative immunity as a ground for summary judgment. *See* Tex.R. Civ. P. 166a(c) (providing that summary judgment motion "shall state the specific grounds therefor"); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339 & n. 2 (Tex.1993) (holding summary

When a party contends that it has not had an adequate opportunity for discovery before a summary judgment hearing, it must file either an affidavit explaining the need for further discovery or a verified motion for continuance. *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 647 (Tex.1996); *see* TEX. RS. CIV. P. 166a(g), 251, 252. It is within a trial court's discretion to grant a continuance until the requested discovery is completed. *Levinthal v. Kelsey–Seybold Clinic, P.A.*, 902 S.W.2d 508, 510 (Tex.App.—Houston [1st Dist.] 1994, no writ). We will not disturb the trial court's denial of a motion for continuance except for a clear abuse of discretion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex.1986); *Verkin v. Southwest Ctr. One, Ltd.*, 784 S.W.2d 92, 94 (Tex. App.—Houston [1st Dist.] 1989, writ denied).

In deciding whether the trial court abused its discretion in denying a rule 166a(g) motion for continuance, we consider the length of time the case had been on file, the materiality of the discovery sought, whether the party seeking the continuance had exercised due diligence in attempting to obtain the discovery sought, and what the party expects to prove. *Laughlin v. Bergman*, 962 S.W.2d 64, 65–66 (Tex.App.—Houston [1st Dist.] 1997, pet. denied); *McAx Sign Co. v. Royal Coach, Inc.*, 547 S.W.2d 368, 370 (Tex.Civ. App.—Dallas 1977, no writ); *see* TEX.R. CIV. P. 252.

239 JV filed its petition April 18, 1997; Joe and J & G filed answers on May 12; Joe filed his motion for summary judgment on June 12; and the trial court granted Joe's motion on July 11. Thus, the suit had been on file three months before summary judgment was granted. Trial courts have abused their discretion in

denying continuances when cases have been on file for three, *Levinthal,* 902 S.W.2d at 510, six, *Verkin,* 784 S.W.2d at 94–95, and eleven months, *Laughlin,* 962 S.W.2d at 66, when due diligence and materiality of discovery are established.

To establish due diligence, 239 JV's counsel filed a motion for continuance with an affidavit stating he had not had an adequate opportunity for discovery before a summary judgment hearing. The motion stated that counsel needed additional time to conduct discovery regarding whether Joe acted as a councilman and J & G's representation of 239 JV. In his affidavit, lead counsel stated that, while the suit had been on file two months, lead counsel was in an out-of-town trial from the time of Joe's answer to the suit until June 10. Joe's motion for summary judgment was served June 12 and was set for July ˙ 11. Correspondence between 239 JV's counsel and appellees' counsel shows that on June 17, 239 JV's counsel attempted to depose Joe and others. However, appellees' counsel refused, stating, "[W]e will take the position that you are entitled to no discovery until after the Court has determined the issue of immunity." Thus, counsel's attempts to procure testimony within three months of filing suit showed due diligence in attempting to obtain discovery. *See id.* at 66.

Because due diligence is only part of the test, counsel must show that the testimony is relevant to the immunity defense. Official immunity only shields persons from suits complaining of official acts. *Bonham v. Flach,* 744 S.W.2d 690, 692–93 (Tex. App.—San Antonio 1988, no writ); *Bagg v. Univ. of Tex. Med. Branch at Galveston,* 726 S.W.2d 582, 586 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). In its motion for continuance, 239 JV questioned whether all Joe's actions were as a council

judgment motion must expressly state reasons

movant is entitled to summary judgment).

member and in good faith, in that he had done legal research and turned it over to an advocacy group, and was acting as counsel for the city in conflict with 239 JV's interest. These issues could controvert Joe's allegations that all his actions and advocacy were performed in his discretionary duties as an Irving City Council member, in good faith, and within his authority as a council member.

■ Joe, however, argues that *Mayhew v. Town of Sunnyvale,* 774 S.W.2d 284 (Tex.App.—Dallas 1989, writ denied), mandates that no depositions are proper. *Mayhew* involved judicial review of legislation. This Court held that individual legislators may not be questioned to determine the evidence upon which they relied or their reasons for a particular vote. *Id.* at 298. Unlike the authority cited by Joe that involve a dispute about the validity or legality of city council actions, *see id.; Sosa v. City of Corpus Christi,* 739 S.W.2d 397, 404–05 (Tex.App.—Corpus Christi 1987, no writ), this suit questions Joe's acts as a lawyer. When a claimant brings an action against an officeholder in an individual capacity, discovery, including the deposition of the officeholder, is appropriate. *See State v. Sims,* 871 S.W.2d 259, 263 (Tex.App.—Amarillo 1994, orig. proceeding). Here, 239 JV is not trying to determine the reasons for the zoning restriction; rather, it is attempting to determine all Joe's individual acts concerning the moratorium. Any such acts he took in his individual capacity would not be protected by governmental immunity. *See Bagg,* 726 S.W.2d at 586–87. Therefore, the discovery requested was relevant to the issues involved in this case.

■ Denial of a continuance is an abuse of discretion when it prohibits a party from engaging in meaningful discovery and forecloses the plaintiff's case. *See Laughlin,* 962 S.W.2d at 66. Therefore, the trial court abused its discretion in not granting the continuance because due diligence was demonstrated and 239 JV was denied any discovery when some of its claims could be maintained against Joe in his individual capacity. We sustain 239 JV's first point of error. Further, because evidence discovered during the continuance may raise fact issues on Joe's individual acts and his governmental immunity defense, the trial court improperly granted summary judgment in Joe's favor on grounds of immunity after refusing to grant a continuance. Because we need not address the merits of Joe's motion for summary judgment, we need not address 239 JV's second point of error.

## J & G'S MOTION FOR SUMMARY JUDGMENT

In its third point of error, 239 JV challenges the trial court's granting of J & G's motion for summary judgment. The traditional and no-evidence motion raised six grounds for summary judgment: J & G cannot be held liable because Joe is immune from suit; the Local Government Code relating to conflict of interest provides 239 JV's exclusive remedy; J & G did not owe its clients a duty to influence or control Joe's actions as a public servant; 239 JV cannot establish proximate cause; 239 JV waived any conflict or claim for malpractice; and 239 JV has not sustained damages. 239 JV argues that J & G owed 239 JV a duty of loyalty and fiduciary duties that were not affected by Joe's status as a city council member. 239 JV also contends that J & G failed to prove these grounds as a matter of law and that genuine issues of material fact exist.

### Standard of Review

■ Summary judgment is proper when the movant establishes that there is no genuine issue of material fact and he is

entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *see City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). The question on appeal is not whether the summary judgment proof raises a fact issue with reference to the essential elements of the plaintiff's causes of action, but whether the summary judgment proof establishes that the movant is entitled to summary judgment as a matter of law. *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex.1990). A defendant is entitled to summary judgment when he disproves, as a matter of law, one of the essential elements of each of the plaintiff's causes of action. *Lear Siegler, Inc. v.. Perez*, 819 S.W.2d 470, 471 (Tex.1991).

■■■■■ A no-evidence summary judgment asserts that there is no evidence of one or more essential elements of claims upon which the opposing party would have the burden of proof at trial. Tex.R. Civ. P. 166a(i). A no-evidence summary judgment is essentially a pretrial directed verdict to which we apply the same legal sufficiency standard of review. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex.App.—Dallas 2000, no pet.); *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 70 (Tex.App.—Austin 1998, no pet.). Although the nonmoving party is not required to marshal its proof, it must present evidence that raises a genuine fact issue on the challenged elements. *McCombs v. Children's Med. Ctr.*, 1 S.W.3d 256, 258 (Tex.App.—Texarkana 1999, pet. denied) (citing Tex.R. Civ. P. 166a cmt.). A no-evidence summary judgment is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to the challenged element of the claims. Tex.R. Civ. P. 166a(i); *Jackson*, 979 S.W.2d at 70–71.

■■■■ In reviewing the grant of summary judgment pursuant to either rule 166a(c) or (i), we view the evidence in the light most favorable to the nonmovant and make every reasonable inference and resolve all doubts in favor of the nonmovant. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Gen. Mills Rests., Inc.*, 12 S.W.3d at 833 (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)).

## The Breach of Fiduciary Duty and Loyalty Claim

■■■ 239 JV alleged that Joe and J & G breached their fiduciary duties and duties of loyalty to 239 JV when Joe did not disclose his conflict of interest with 239 JV on the impending vote on the moratorium as well with as his actual vote and participation in moratorium activities. J & G asserted in its motion for summary judgment that J & G had no duty concerning Joe's actions because he was a public official and there was neither proximate cause nor permissible damages. J & G also argues that the violation of any Texas Disciplinary Rule of Professional Conduct cannot be used to support civil liability.

### Civil Liability

■■■■ The elements of a legal malpractice claim are (1) duty, (2) a breach of duty, (3) the breach proximately caused the injury, and (4) resulting damages. *Peeler v. Hughes & Luce*, 868 S.W.2d 823, 827–28 (Tex.App.—Dallas 1993), *aff'd*, 909 S.W.2d 494 (Tex.1995); *see Onwuteaka v. Gill*, 908 S.W.2d 276, 281–82 (Tex.App.—Houston [1st Dist.] 1995, no writ). A lawyer in Texas is held to the standard of care that would be exercised by a reasonably prudent attorney. *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex.1989) (op. on reh'g); *see Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex.1996). Additionally, attor-

neys have a fiduciary relationship with their clients as a matter of law. *Gen. Motors Acceptance Corp. v. Crenshaw, Dupree & Milam, L.L.P.*, 986 S.W.2d 632, 636 (Tex.App.—El Paso 1998, pet. denied) (citing *Cooper v. Lee*, 75 Tex. 114, 120–21, 12 S.W. 483, 486 (1889)).

 Here, 239 JV and its expert used the Texas Disciplinary Rules of Professional Conduct to demonstrate the standard of care and duties of an attorney to avoid conflicts and keep the client informed. The preamble of the Disciplinary Rules states that the rules are not to define the standards of civil liability. TEX. DISCIPLINARY R. PROF'L CONDUCT preamble ¶ 15, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9) ("Violation of a rule does *not* give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached."). However, the preamble does not comment on and is not inconsistent with the use of the rules as evidence of a violation of an existing duty of care, as provided for by the Restatement (Third) of the Law Governing Lawyers. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 52(2) & cmt. (f) (2000). Section 52(2) provides that a rule or statute regulating the conduct of lawyers does not give rise to an implied cause of action for professional negligence or breach of fiduciary duty, but it may be considered by a trier of fact in understanding and applying the standard of care for malpractice or determining a breach of fiduciary duty. *Id.* § 52(2). This provision reflects a common-sense approach to using the rules of conduct in a malpractice or breach of fiduciary duty action. A standard of care in a professional negligence suit does and should reflect work custom. Note, *The Evidentiary Use of the Ethics Codes in Legal Malpractice: Erasing a Double Standard,* 109 HARV. L.REV. 1102, 1118 (1996) (citing Charles W. Wolfram, *The Code of Professional Responsibility as a Measure of Attorney Liability in Civil Litigation,* 30 S.C. L.REV. 281, 294 (1979)). Lawyers have established codes of conduct to reflect a professional consensus that no attorney shall fall below. *Id.; see* TEX. DISCIPLINARY R. PROF'L CONDUCT preamble ¶ 7. Barring the use of the code and denying that the code is relevant to the duties a lawyer has to his client is not logical and would require the re-creation of a standard of care without reference to verifiable or pre-existing rules of conduct. Note, *supra,* at 1119. Therefore, the trier of fact may consider the construction of a relevant rule of professional conduct that is designed for the protection of persons in the position of the claimant as evidence of the standard of care and breach of the standard. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 52, cmt. (f).

 Notwithstanding the disciplinary rules, an attorney's duty of care includes the duty to avoid conflicts of interest that may impair the attorney's ability to exercise independent professional judgment on behalf of the client. *Id.* § 16(3); 1 GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING § 4.4 (2001). And the duty to avoid conflicts of interest is a key aspect of the fiduciary duty that an attorney owes to his client generally. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 16(3). When a lawyer continues representation with the possibility of a conflict without obtaining properly informed consent from the affected client, there is a breach of the duty of loyalty. 1 HAZARD & HODES, *supra,* § 4.4. Because avoiding conflicts of interest and thereby observing the fiduciary duty of loyalty is an action that a reasonably prudent lawyer would observe in relation to the client, a lawyer can be civilly liable to a client if the

lawyer breaches a fiduciary duty to a client by not avoiding impermissible conflicts of interest, and the breach is a legal cause of injury. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 16(3), 49; 1 HAZARD & HODES, *supra*, § 4.4; *see Arce v. Burrow*, 958 S.W.2d 239, 245–46 (Tex.App.—Houston [14th Dist.] 1997) (describing attorney's fiduciary duty to client), *aff'd in part & rev'd in part on other grounds*, 997 S.W.2d 229 (Tex.1999).

Finally, the liability would extend to the firm and any member of the firm that engaged in the prohibited conduct. *See Cook v. Brundidge, Fountain, Elliott & Churchill*, 533 S.W.2d 751, 758 (Tex.1976) (noting extent of partner's authority is "determined essentially by the same principles as those measuring the scope of the authority of an agent"); *Metroplex Glass Ctr., Inc. v. Vantage Props., Inc.*, 646 S.W.2d 263, 266 (Tex.App.—Dallas 1983, writ ref'd n.r.e.) (noting it is well settled "that a partner may act as an agent within the scope of his authority to represent and bind the partnership"); *see also DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995) (under respondeat superior, principal is vicariously liable for negligence of agent acting within scope of agency, although principal has not personally committed wrong); RESTATEMENT (SECOND) OF AGENCY § 219 (1958); TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(f) ("If a lawyer would be prohibited by this Rule from engaging in particular conduct, no other lawyer while a member or associated with that lawyer's firm may engage in that conduct.").

3. The dissent does not dispute that an attorney has a fiduciary duty or a duty of loyalty that can be enforced in civil litigation.

4. The current Model Rules of Professional Conduct do not specifically address the attorney-public official conflict. Model Rule 1.11(c) provides that a lawyer serving as a public official shall not participate in a matter

*Duty of Attorney Public Official*

▇ The issue in determining whether a duty exists in this case is whether the duty to avoid conflicts with a client includes an attorney's public service as a government official.[3] Most situations involving a conflict of interest involve situations where an attorney-legislator votes or advocates positions that are favorable to the client's interest. The issue addressed here is whether promoting the public official's public agenda conflicts with the client's interest, to whom an attorney owes a continuing duty of loyalty, independent of any duty as a public official. According to the Restatement (Third) of the Law Governing Lawyers, most reported decisions do not prohibit most legislative activity that might favor private clients except where prohibited by law. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 135, reporter's note cmt. f(i) (citing, e.g., *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938 (11th Cir.1982)). The Model Code of Professional Responsibility and the Disciplinary Rules reflected the notion that an attorney-legislator may participate in legislative activities that are favorable to the client:

> A lawyer who holds public office shall not ... [u]se his public position to obtain, or attempt to obtain, a special advantage in legislative matters for himself or for a client under circumstances where he knows or it is obvious that such action is not in the public interest.

MODEL CODE OF PROF'L RESPONSIBILITY DR 8–101(A)(1) (1969).[4] This Disciplinary

in which the lawyer participated personally and substantially while in private practice. MODEL RULES OF PROF'L CONDUCT R. 1.11(c)(1) (1983). This rule does not address the duties owed to the client when a public stance is adverse to that client's interest.

Rule allowed most activity and would be difficult to violate as an officeholder acting in the interest of his client. However, this rule did not address whether there is a conflict of interest when an attorney-legislator acts in his legislative capacity against the interest of his client.

Nevertheless, J & G contends that all Joe's actions were as a legislator, not an attorney, and should be judged against the duties of a public official to the public. Joe states in his amended affidavit:

> My position on the issue of multi-family housing in Irving is my own, based upon my own political beliefs, formulated in response to the desires of those who I believe elected me. I concluded that it was in the best interest of the City of Irving to impose and continue the moratoria [on building and developing apartments] pending a comprehensive plan for development in the City.

J & G claims that because Joe's duties are to the public, J & G has no duty to control his activities. This necessarily means that J & G would not be responsible for conflict checks for a partner who is also a public official. Accordingly, Joe could never have a conflict of interest between his public duties and J & G clients if he opposed the interest of those clients in his public service. This position ignores the fact that attorneys can have conflicts other than the representation of other clients. Section 135 of the Restatement (Third) of the Law Governing Lawyers articulates the prohibition of representation without appropriate disclosure to a client for conflicts that can occur when a lawyer has a fiduciary or other legal obligation to a nonclient:

Unless the affected client consents to the representation under the limitations and conditions provided in § 122[5], a lawyer may not represent a client in any matter with respect to which the lawyer has a fiduciary or other legal obligation to another if there is substantial risk that the lawyer's representation of the client would be materially or adversely affected by the lawyer's obligation.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 135. In commenting on the types of conflicts that can occur, the Restatement notes that "[p]ublic duties can impair the lawyer's effective representation of private clients, requiring that the lawyer-official not represent the affected client, withdraw from the representation, or obtain effective consent." *Id.* § 135, cmt. (f)i.

The Texas Disciplinary Rules of Professional Conduct recognize conflicts of interest that occur because of responsibilities other than to another client:

> [A] lawyer shall not represent a person if the representation of that person ... reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities ... to a third person or by the lawyer's or law firm's own interests.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(b)(2). The comments reflect the difficulty of assessing conflicts of interest in contexts other than litigation. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06, cmt. 13. The relevant factors to be considered in determining the potential for conflict causing an adverse effect in nonlitigation conflict situations include:

---

**5.** Section 122 provides that a lawyer can continue to represent a client when there is a conflict if the client is given adequate information about the risks of such representation. This section also delineates when a lawyer is prohibited from representing a client even if

there is informed consent. Those instances are when the representation is prohibited by law, the clients will be suing each other, or it is not reasonable that the lawyer will provide adequate representation to one or more of the clients.

- the duration and intimacy of the lawyer's relationship with the client or clients involved,
- the functions being performed by the lawyer,
- the likelihood that actual conflict will arise, and
- the likely prejudice to the client from the conflict if it does arise.

*Id.* Further, Disciplinary Rule 1.13(a) provides:

A lawyer serving as a director, officer or member of a legal services, civic, charitable or law reform organization, apart from the law firm in which the lawyer practices, shall not knowingly participate in a decision or action of the organization ... if participating in the decision would violate the lawyer's obligations to a client under Rule 1.06[.]

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.13(a).[6] Although the Texas disciplinary rules do not specifically discuss a lawyer's conflicts with positions that might be taken when holding public office, the duty of loyalty and the prevention of conflicts between a lawyer's personal or civic interest and the interests of a client are recognized duties.[7]

Alternatively, J & G contends that any conflict of interest concerning Joe's activities as a city council member would be governed exclusively by the Local Government Code. Section 171.004(a) of the code provides that a public official who has a substantial interest in a business entity or real property shall not participate in a vote or decision in any matter involving that entity or property if the action on the matter of the business entity will have a special economic effect on the entity that is distinguishable from the effect on the public, or it is reasonably foreseeable that an action on the matter of the real property will have a special economic effect on the value of the property distinguishable from its effect on the public. TEX. LOC. GOV'T CODE ANN. § 171.004(a)(1), (2) (Vernon 1999). This provision addresses situations in which a public official's personal interest conflicts with the public interest. But it does not address when a public official's position conflicts with his client's interest. While the statute further states that the chapter on conflicts preempts the common law of conflicts of interest as applied to local public officials, *id.* § 171.007 (Vernon 1999), the context of the chapter only deals with the ability of the local public official to vote on an issue and the validity of the vote. Here, the validity of Joe's moratorium vote is not questioned. No conflict with the public interest is being litigated. The statute does not preempt all other duties a public official may have as a private citizen. Therefore, whether Joe had a conflict of interest with 239 JV is not determined by the statute. Accordingly, we review the summary judgment evidence to determine whether it raises a fact issue on breach of an attorney's duty to avoid conflicts of interest with a client.

239 JV's summary judgment evidence demonstrates that J & G's representation of the joint venture in the sale of the

---

**6.** J & G argues that comment 3 demonstrates that a lawyer is allowed to have conflicting views with those of his client because a lawyer's representation of a client does not constitute an endorsement of the client's political, social, or economic views. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.13, cmt. 3. However, the comment is a generalization and only relates to activities of a member of a legal reform organization. *See id.* Joe's zoning activities were not part of any legal reform organization, and, therefore, the comment is irrelevant to the issues in this case.

**7.** In fact, the dissent agrees that a public official/attorney has a continuing duty of loyalty to clients in regards to the matters of the attorney's representation.

property began in 1992 and continued through June 1996, as reflected in J & G's billing records. The purpose of J & G's representation was to provide legal assistance in selling the property for apartment development. However, there is evidence that, during this representation, Joe organized, advocated, and voted against apartment development that, in effect, actively stopped 239 JV's sale of its apartment property. No attempt was made to determine whether this position would affect clients of the firm. Expert testimony was presented that the nondisclosure of the conflict was a breach of the standard of care. *See Jatoi v. Decker, Jones, McMackin, Hall & Bates,* 955 S.W.2d 430, 433 (Tex.App.—Fort Worth 1997, pet. denied) (noting expert testimony required to establish compliance with attorney's standard of care and citing *Hall v. Rutherford,* 911 S.W.2d 422, 424 (Tex.App.—San Antonio 1995, writ denied)). This summary judgment evidence raises a fact issue on whether the functions being performed by the law firm would conflict with and be prejudiced by Joe's activity. Contrary to the dissent's claim that there was no conflict because J & G did not represent 239 JV before the city council on zoning matters, we conclude the evidence raises a fact issue on whether Joe's activities on behalf of the moratorium prejudiced 239 JV's interests in regards to the particular matter on which J & G represented 239 JV, the sale of the property for apartment development, and whether this prejudice is a breach of duty to the firm's client. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06, cmt. 13. Thus, the evidence is sufficient to raise a fact issue concerning breach of the standard of care and breach of fiduciary duty and duty of loyalty.

*Proximate Cause*

Breach of duty or standard of care is not sufficient without the breach being the proximate cause of an injury to the client. In a malpractice claim, a party must prove both cause-in-fact and foreseeability to show proximate cause. *Hall v. Stephenson,* 919 S.W.2d 454, 465–66 (Tex. App.—Fort Worth 1996, writ denied) (citing *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995)). Cause-in-fact means that the defendant's act or omission was a substantial factor in bringing about the injury that would not otherwise have occurred. *Prudential Ins. Co. v. Jefferson Assocs. Ltd.,* 896 S.W.2d 156, 161 (Tex. 1995). Foreseeability means that the actor should have anticipated injury to others. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992) (op. on reh'g). Foreseeability does not require that the actor anticipate the precise consequences of his actions. *Id.*

Because there is no dispute about foreseeability, we need only consider whether there is any evidence about cause-in-fact. J & G argues that because the council's vote causing the moratorium was unanimous, Joe's actions were not the cause of the canceled contract for the sale of the apartment property, and the moratorium on apartment development would have occurred anyway. However, 239 JV presented evidence that if it had been informed of the conflict caused by the support of the moratorium, it could have filed a plat and "grand-fathered" the apartment tract from the effects of any moratorium. The sale could have been completed. In a deposition, Art Hewitt, a 239 JV representative, stated that Joe should have told his partners handling 239 JV's business that the moratorium was coming up, he was supporting it, and clients should be informed and let them take appropriate action. According to Hewitt, another development project was able to obtain exemption from the moratorium. There was also evidence that Joe and J & G told 239 JV represen-

tatives that the firm would help in obtaining a waiver from the moratorium after the September 1994 vote, allowing 239 JV to pursue other sales. Thus, there is evidence raising a fact issue that failure to disclose the conflict between Joe's advocacy and the client's economic interest—not the moratorium itself—caused economic harm to 239 JV.

This is contrary to the dissent's assertion that the outcome was inevitable because of the unanimous city council vote. Whether 239 JV could have known of the special meeting and the agenda would not relieve J & G of any conflict caused by its attorneys' involvement in anti-apartment development and pro-moratorium activities to the detriment of the sale of 239 JV's property. Joe prejudiced his firm's clients' interests by failing to inform the firm of the conflict between the client's interest and his support for the moratorium "in the public interest." That prejudice could have been avoided. This evidence is sufficient to raise a fact issue on cause-in-fact.

### Damages

▆▆▆▆ The law requires a necessary showing of a causal relation between the act complained of and the injury sustained. *See Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223–24 (Tex.1988). Generally, the proper measure of damages in a legal malpractice case is that amount of damages that would have been collectible but for the wrongful act or omission of the attorney. *Gibson v. Johnson*, 414 S.W.2d 235, 238–39 (Tex.Civ.App.—Tyler 1967, writ ref'd n.r.e.). Because this case involves the failure of a sales transaction as a result of Joe's alleged wrongful acts and

omissions, the damages suffered by appellants would be economic. The measure of damages in a commercial relations tort may be "economic," although they are damages for the tort. *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex.1990) (measure of actual damages for tortious interference with contract same as measure of damages for breach of the contract interfered with). In this malpractice case, 239 JV seeks restoration to the position in which it would have been had the sale been completed. Generally, a party is entitled to all actual damages necessary to put it in the same economic position in which it would have been had the contract been fulfilled. *See id.; Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex.App.—El Paso 2000, no pet.). Damages protect three interests: a restitution interest, a reliance interest, and an expectation interest. *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 247 (Tex.App.—San Antonio 1998, pet. denied) (op. on reh'g). A party's expectation interest is measured by his anticipated receipts and losses caused by the breach less any cost or other loss he has avoided by not having to perform. *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 187 (Tex.App.—Austin 1998, pet. denied) (citing RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981)); *Coon v. Schoeneman*, 476 S.W.2d 439, 441 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). To restore an injured party to the position in which he would have been had the contract been performed, it must be determined what additions to the injured party's wealth have been prevented by the breach and what subtractions from his wealth have been caused by it.[8] *See Interceramic, Inc.*

---

**8.** The parties cite *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41 (Tex.1998) (op. on reh'g). J & G claims the case supports its contention that

239 JV's damages are speculative. 239 JV contends that *Formosa* supports its theory that the foreseeable profits from other businesses may be a loss as result of a tort. In

*v. S. Orient R.R. Co.,* 999 S.W.2d 920, 927–28 (Tex.App.—Texarkana 1999, pet. denied); *Lafarge Corp.,* 977 S.W.2d at 187; *Mistletoe Express Serv. v. Locke,* 762 S.W.2d 637, 638 (Tex.App.—Texarkana 1988, no writ).

239 JV presented evidence through an expert that the loss of the sale cost it $119,770 in carrying costs and that the reasonable value of investing the proceeds from the sale would have produced a rate of return calculated by the rates of return on an average investment or another 239 JV investment opportunity. The total estimated damages were between $1,442,157 and $1,939,590.

■ To withstand no evidence review, "[a]t a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data ... [and][r]ecovery of lost profits must be predicated on one complete calculation." *See Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam). The expert's affidavit contained not only the statements of the expert but also attached documentation showing the damages calculation based on the proceeds that would have been realized had the sale been completed. We conclude the evidence is sufficient to raise a fact issue as to the damages 239 JV sustained.

Thus, we conclude that 239 JV presented evidence to create a fact issue concerning the causes of action against J & G.

### Waiver

■ Notwithstanding, J & G responds that the evidence shows that 239 JV continued to use the services of J & G after the conflict of interest with Joe's position

was apparent. The firm claims this is a waiver of the conflict or at least a waiver of an action against the firm.

■ First, waiver of a conflict of interest requires a client's consent before the attorney takes the conflicting position or represents the adverse client. Here, there was no notice to and no consent by 239 JV prior to Joe's advocacy or votes for the moratorium. Thus, 239 JV's continued representation by J & G is no evidence of consent to the conflict.

■ Next, for 239 JV to have waived its action against J & G, the summary judgment evidence must show 239 JV had (1) an existing right, benefit, or advantage; (2) actual or constructive knowledge of its existence; and (3) an actual intent to relinquish the right (which can be inferred from conduct). *Dallas Area Rapid Transit v.. Dallas Morning News,* 4 S.W.3d 469, 475–76 (Tex.App.—Dallas 1999, no pet.); *see Tenneco Inc.,* 925 S.W.2d at 643. Intent is the key element in establishing waiver. *G.H. Bass & Co. v. Dalsan Properties-Abilene,* 885 S.W.2d 572, 577 (Tex.App.—Dallas 1994, no writ); *Vessels v. Anschutz Corp.,* 823 S.W.2d 762, 765 (Tex.App.—Texarkana 1992, writ denied); *FDIC v. Attayi,* 745 S.W.2d 939, 947 (Tex.App.—Houston [1st Dist.] 1988, no writ). The law on waiver distinguishes between a showing of intent by actual renunciation and a showing of intent based on inference. *Attayi,* 745 S.W.2d at 947. In the latter situation, it is the burden of the party who is to benefit by a showing of waiver to produce conclusive evidence that the opposite party unequivocally manifested its intent to no longer assert its claim.

*Formosa,* the court held that while a benefit-of-the-bargain measure can include lost profits, it only compensates for the profits that would have been made if the bargain had been performed as promised. *Id.* at 50. 239

JV's damages are based on the performance of the sales contract that was abandoned because Joe failed to disclose his opposition to apartment development. We conclude *Formosa* does not prohibit recovery for 239 JV.

*Id.* This is a particularly onerous burden. *Id.*

Ordinarily, the issue of waiver is a question of fact. *See Dallas Area Rapid Transit,* 4 S.W.3d at 475. Where facts are clearly established and are undisputed, however, waiver becomes a question of law. *See id.* at 475–76.

Here, there is no unequivocal assertion that 239 JV was abandoning any claim against the law firm. J & G's evidence is that 239 JV continued to use J & G's legal services and did not immediately pursue any claim against it. 239 JV presented evidence through the deposition testimony of Art Hewett and the affidavit of Richard Strauss that 239 JV remained with the firm because J & G's executive committee was going to try to resolve the moratorium situation. Thus, 239 JV raised a fact issue concerning waiver of its causes of action.

## IMMUNITY DEFENSES

As grounds for the summary judgment, J & G alleged Joe's possible defenses of legislative and official immunity. Legislative immunity protects only those duties that are functionally legislative. *Bowles,* 920 S.W.2d at 758. Courts have consistently recognized a distinction between the legislative act of establishing a policy, act, or law and the nonlegislative act of enforcing or administering that policy, act, or law. *Id.* J & G points to the votes for the moratorium, the apartment development, and the extensions, characterizing them as legislative acts that determine policy. Whether Joe, and consequently J & G, would be immune from the damage from the vote does not address the duty to disclose conflicts of interest to a client. Legislative immunity is only a shield for legislative duties, not for the private duties of an attorney to his client. Here, the actual vote is evidence of the conflict with the client's interest, not the

basis of liability. Likewise, the defense of official immunity only shields persons from suits complaining of official acts. *Bonham,* 744 S.W.2d at 692–93. The acts complained about were the continued representation without disclosure of the conflict with 239 JV's interests. Those are not official acts but acts of an attorney. Therefore, J & G did not conclusively demonstrate any immunity defense.

Because 239 JV presented evidence on each element of its malpractice claim and J & G failed to conclusively demonstrate any immunity defense or waiver, we conclude the trial court improperly granted summary judgment in J & G's favor. Therefore, we sustain 239 JV's third point of error.

## CONCLUSION

Having sustained 239 JV's first and third points of error, we reverse the trial court's grant of summary judgment in Joe's favor and in J & G's favor and remand 239 JV's causes of action against them for further proceedings.

FITZGERALD, Justice, dissenting.

I believe the trial court did not clearly abuse its discretion in denying the motion for continuance by appellant Two Thirty Nine Joint Venture ("239 JV"). Moreover, I would affirm the trial court's summary judgments on behalf of both appellees Harry J. Joe ("Joe") and Jenkens & Gilchrist, P.C. ("J & G"). I am concerned about the duty created today by the majority that may affect lawyers serving in the public sector. Therefore, I respectfully dissent.

### PROCEDURAL BACKGROUND

239 JV filed suit against both Joe and J & G on April 18, 1997, alleging a breach of their fiduciary duties, specifically their

duty of loyalty, to 239 JV. The defendants answered on May 12, 1997, both affirmatively pleading, *inter alia,* the defense of immunity based upon Joe's service on the City Council of the City of Irving.[2] On June 12, 1997, Joe filed his motion for summary judgment based solely on the affirmative defense of immunity. 239 JV responded initially with a motion for continuance, seeking postponement of the summary judgment hearing—then set for July 11, 1997—so that it could initiate discovery. Although the case was set for trial on November 3, 1997, 239 JV had undertaken no discovery at all. The trial court denied the motion for continuance and granted Joe's motion for summary judgment. Over the next year, the remaining parties conducted discovery. In August 1998, J & G filed its amended motion for summary judgment, with its six separate grounds, that is at issue in this appeal. The trial court granted the amended motion on unspecified grounds. This appeal followed.

### THE MOTION FOR CONTINUANCE

In 239 JV's first point of error, it complains that the trial court abused its discretion in denying 239 JV's Motion for Continuance of Joe's Summary Judgment Hearing. 239 JV's motion argued that it had been unable to conduct discovery earlier, but it required discovery to prepare an adequate response to Joe's summary judgment motion. The granting or denial of a motion for continuance is within the trial court's sound discretion and will not be disturbed absent a clear abuse of discretion. *Gen. Motors Corp. v. Gayle,* 951 S.W.2d 469, 476 (Tex.1997); *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986); *Dallas Indep. Sch. Dist. v. Finlan,* 27

S.W.3d 220, 235 (Tex.App.—Dallas 2000, no pet.). The court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 243 (Tex.1985). An appellate court may reverse a trial court for abuse of discretion only if, after searching the record, it is clear the trial court's decision was arbitrary and unreasonable. *Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 795 (Tex.1987); *DISD,* 27 S.W.3d at 235.

In reviewing the denial of a rule 166a(g) motion for continuance, we consider three factors: (1) the length of time the case had been on file; (2) whether the party seeking the continuance had exercised due diligence in attempting to obtain the discovery sought; and (3) the materiality of the discovery sought. *Laughlin v. Bergman,* 962 S.W.2d 64, 65–66 (Tex.App.—Houston [1st Dist] 1997, no pet.); *Levinthal v. Kelsey–Seybold Clinic,* 902 S.W.2d 508, 510 (Tex.App.—Houston [1st Dist.] 1994, no writ). Unless these three factors are addressed specifically and by affidavit, the trial court's ruling will not be overturned. *McAx Sign Co. v. Royal Coach, Inc.,* 547 S.W.2d 368, 369 (Tex.Civ.App.—Dallas 1977, no writ). In this instance, neither the motion for continuance nor the accompanying affidavit establishes an unqualified right to a continuance.

### *Length of Time on File.*

239 JV filed its motion for continuance when the case had been on file approximately two and one-half months. The summary judgment hearing was scheduled approximately three months from the date of 239 JV's original petition. Trial was scheduled less than four months after that hearing date. Under that circumstance,

---

**2.** It is undisputed Joe was a member of the Irving City Council from May 1989 to May 1997.

each month that passed without the plaintiff moving its case forward was significant. Under any circumstances, a trial court considering a continuance request can presume a plaintiff has investigated its case before filing. *DISD*, 27 S.W.3d at 236; *White v. Mellon Mortgage Co.*, 995 S.W.2d 795, 804 (Tex.App.—Tyler 1999, no pet.); *McAllister v. Samuels*, 857 S.W.2d 768, 773 (Tex.App.—Houston [14th Dist.] 1993, no writ). Finally, analysis of this factor must be tempered by the understanding that the defense of immunity is properly decided by a summary judgment motion soon after the original claim is filed. *See Albright v. Tex. Dep't of Human Servs.*, 859 S.W.2d 575, 579 n. 1 (Tex. App.—Houston [1st Dist.] 1993, no writ) (citing TEX. CIV. PRAC. & REM.CODE § 51.014(5)) (allowing interlocutory appeal of order denying summary judgment based on governmental immunity) and *Nieto v. San Perlita Indep. Sch. Dist.*, 894 F.2d 174, 177 (5th Cir.1990) (qualified immunity issues "should be resolved at the earliest possible stage of litigation"). Indeed, in an immunity case, so long as a party receives notice of the summary judgment hearing in excess of the twenty-one days required by rule 166a, denial of a motion for continuance is generally not an abuse of discretion. *Cronen v. Nix*, 611 S.W.2d 651, 653 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.).

The majority focuses solely on the number of months the case had been on file and not on the overall context of the case. The majority cites three cases in which appellate courts reversed the denial of a continuance, noting for each only the length of time the case had been on file. However, each of these cases is distinguishable from the instant case. In *Laughlin*, for example, the parties had already engaged in "initial discovery," and the attorneys had agreed on a date to depose the defendant that would fall after the scheduled summary judgment hearing. 962 S.W.2d at 65–66. Likewise, in *Levinthal*, the plaintiff had served written discovery with his petition, and the defendant had scheduled his summary judgment hearing before those discovery responses were due. 902 S.W.2d at 510. Finally, in *Verkin v. Southwest Center One, Ltd.*, 784 S.W.2d 92, 95–96 (Tex.App.—Houston [1st Dist.] 1989, writ denied), the defendant moved for the continuance, not the plaintiff, and the motion was uncontroverted. None of the majority's cases involved a plaintiff who had failed to conduct any discovery before the summary judgment motion was filed. *See* discussion of due diligence, *infra*. And none of the majority's cases involved the defense of governmental immunity, which is properly decided by a summary judgment motion soon after the original claim is filed. *See Albright*, 859 S.W.2d at 579 n. 1.

Appellate opinions on the subject of summary judgment continuances will inevitably be fact-specific. The rules do not set any minimum amount of time a case must be on file before summary judgment can be granted, and the granting of a continuance before consideration of a summary judgment motion is left to the trial court's discretion. Thus the procedural stance of the individual case must be carefully analyzed. Our review should not be restricted to a purely mathematical calculation, that is, a recount of the number of months the matter has been on file. In this instance, the trial court determined the case had been on file a sufficient amount of time for the summary judgment motion to proceed. I see no abuse of discretion in this determination.

*Due Diligence.*

The record does not indicate that 239 JV sought discovery diligently before it filed its continuance motion. Indeed, the rec-

ord does not indicate that 239 JV sought discovery at all before it filed its continuance motion. The affidavit of 239 JV's lead counsel, Donald Godwin, declares that he was in trial for several weeks after the case was filed. However, another attorney's name from Mr. Godwin's firm appeared on both the original petition and the motion for continuance; Mr. Godwin had assistance in this case. The record does not indicate that 239 JV propounded any written discovery to Joe, and the record reveals absolutely no effort by 239 JV to take deposition testimony from Joe or any other witness in the case before Joe filed his motion for summary judgment. The record contains no deposition notice and no correspondence requesting specific dates for specific deponents. Indeed, the motion's list of potential deponents primarily includes broad categories of unnamed persons: Irving City Council members, members of the Concerned Citizens Coalition, and representatives of J & G. Contrary to the majority's assertion, it is not apparent that 239 JV ever specifically sought Joe's deposition. In fact, no individual deponent is identified by name in the motion. (Even Irving's City Attorney is identified by position, not by name.) In its brief before this Court, 239 JV argues "the deposition of Joe was material to the issues," but it failed to specifically identify Joe in its motion for continuance. The accompanying affidavit declares only a need for "numerous" and "certain" depositions. The trial court could easily have decided those statements lacked the specificity required by rule 166a(g).

Texas law does not require a plaintiff to serve discovery requests at the same time the suit is filed, but when the party that brings suit delays in seeking *any* discovery, it cannot use its own procrastination to thwart a defendant's attempts to move the case forward. *Cf. Levinthal*, 902 S.W.2d at 511–12 (plaintiff, who filed discovery requests and lawsuit simultaneously, used due diligence in attempting to obtain discovery before ruling on motion for summary judgment); *see also Laughlin*, 962 S.W.2d at 66 (plaintiff's scheduling deposition of defendant showed due diligence). The trial court could have concluded that 239 JV failed to exercise due diligence in attempting to procure the testimony it purportedly required.

*Materiality of Discovery Sought.*

The motion for continuance must establish that certain evidence would be material to the summary judgment issues. We must carefully address the nature of the claims at issue in the initial summary judgment proceeding. 239 JV's single claim against Joe was based upon Joe's advocating and voting for the moratorium. Joe moved for summary judgment, claiming official immunity for the conduct at issue. The affirmative defense of official immunity requires proof of a discretionary act, performed in good faith, within the actor's scope of duty as an official. *See Associated Press v. Cook*, 17 S.W.3d 447, 460 (Tex. App.—Houston [1st Dist] 2000, no pet.). 239 JV's response to the summary judgment motion challenged whether Joe's advocating and voting for the moratorium was done in good faith and was within the scope of his authority as a City Councilman. Thus, when it moved for a continuance, 239 JV had the burden: (a) to identify with specificity the evidence it sought to obtain, and (b) to explain how that evidence would be material to the two challenged elements of Joe's immunity defense. 239 JV failed to carry its burden on both counts. Therefore, the trial court correctly denied its motion for continuance. *See Eckman v. Centennial Sav. Bank*, 757 S.W.2d 392, 395–96 (Tex.App.—Dallas 1988, writ denied) (trial court does not abuse its discretion by denying continuance motion when movant fails to show

what evidence it sought to obtain or how evidence was material to the case).

(1) *Identifying the evidence sought.*

239 JV asserted in its motion for continuance that it needed a variety of depositions to prepare an adequate response to Joe's motion. The continuance motion identified several broad categories of potential deponents, including "Irving City Council Members ... Members of the [Valley Ranch Concerned Citizens] Coalition ... representatives of J & G," and one position, Irving's City Attorney. However, 239 JV did not identify in its motion (or in the attached affidavit of its attorney) what specific information it sought from these large groups of people. 239 JV spoke generally to "serious questions" concerning whether Joe was somehow acting as attorney for the City of Irving and for the citizen coalition. But even if those "serious questions" were legitimately raised by the pleaded facts of this case, and I am not persuaded they were, the continuance motion did not identify what information it would seek from the potential deponents concerning those issues. Instead, it appears 239 JV simply hoped that if it deposed enough people it might turn up something helpful. It did not identify any specific facts it sought through discovery, and it is not the obligation of the trial court or this Court to try to identify those facts for the movant. The trial court could have denied the motion for continuance on this ground alone. *See Eckman,* 757 S.W.2d at 396.

(2) *Explaining the materiality of the evidence sought.*

Even if 239 JV's broad assertions concerning possible attorney-client relationships between Joe and other parties somehow met the first prong of its responsibility here, 239 JV failed to show how that information could be material to Joe's defense of immunity. Speculation concerning Joe's motives in advocating the moratorium would not have been relevant to these issues. And no fact 239 JV could assert could change the facts, judicially admitted in its original petition, that Joe was a member of the Irving City Council at the relevant time and that his advocacy (like his voting) was directly related to an issue the Council was deciding at a meeting called for that very purpose.

By denying the continuance motion, the trial court effectively ruled that no discovery was necessary on the issues of good faith and scope of authority. I agree. The court could reasonably have concluded it had all the relevant information necessary to decide Joe's motion for summary judgment.[3] *See Tenneco v. Enter. Prod.*

---

**3.** 239 JV has tried after the fact to identify material evidence it might have sought through further discovery. But even at this late date, 239 JV is still unable to identify any discovery that would have led to facts material to Joe's summary judgment immunity defense. In its Reply Brief to this Court, 239 JV argues that a June 1, 1995 memorandum from William Thau, obtained through discovery after Joe's summary judgment was granted, "would have impacted the [Trial] Court's decision regarding Harry Joe's claim of immunity." The brief does not say *how* the memo was material to the immunity issues. I see no facts in the memo that speak to the reasonableness of Joe's advocacy and vote for the moratorium; I see no facts in the memo that somehow remove Joe's moratorium activities from the appropriate realm of duties assigned to a city councilman.

This 1995 memo is the only "evidence" 239 JV identifies that it might have uncovered if allowed further discovery before Joe's summary judgment hearing. Even with the full benefit of hindsight, 239 JV has been unable to identify some piece of paper, or some passage of testimony, that truly would have raised a fact issue concerning Joe's immunity as a member of the Irving City Council. Given 239 JV's failure to identify any material evidence on the immunity defense, even after deposing Joe fully, I cannot agree with the

*Co.*, 925 S.W.2d 640, 646–47 (Tex.1996) (trial court "had all the relevant information at hand" to decide summary judgment motion and disallowing more time for discovery was within its discretion); *Holguin v. Ysleta Del Sur Pueblo*, 954 S.W.2d 843, 854 (Tex.App.—El Paso 1997, writ denied) (when further discovery would not have been material to the summary judgment ground of tribal sovereign immunity, trial court did not abuse its discretion in denying motion for continuance).

Finally, strong policy concerns argue against the continuance sought by 239 JV. Although the majority frames the issue as whether discovery should be prohibited in immunity-based proceedings, that question can wait for another day. In this case, all that must be decided is whether trial courts have the discretion to *limit* discovery in appropriate immunity-based proceedings, and the Texas Supreme Court has answered that question in the affirmative. *See In re Alford Chevrolet–Geo*, 997 S.W.2d 173 (Tex.1999). Courts are granted this discretion because discovery is not only a "tool for uncovering facts essential to accurate adjudication," but also a "weapon capable of imposing large and unjustifiable costs on one's adversary." *Id.* at 180 (citing Frank H. Easterbrook, Comment, *Discovery as Abuse*, 69 B.U. L.Rev. 635, 636 (1989)). When the adversary is a public official, strong policy imperatives support immunity not only from liability, but also from the burdens of litigation itself. *Teran v. Valdez*, 929 S.W.2d 37 (Tex.App.—Corpus Christi 1996, no writ); *Font v. Carr*, 867 S.W.2d 873, 874

(Tex.App.—Houston [1st Dist] 1993, writ dism'd w.o.j.); *see also Mitchell v. Forsyth*, 472 U.S. 511, 525–26, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (the insulation of officials from burdensome discovery is a function of immunity). In this case, the trial court could have concluded that no material facts remained to be discovered before resolution of the immunity issue. Thus, the trial court was well within its discretion in denying a motion for continuance that would only impose unnecessary burdens on a public official.

Texas Rule of Civil Procedure 166a(a) provides that a party may move for summary judgment *at any time* after the adverse party has answered or appeared. The clear implication of that rule is that sometimes summary judgment is appropriate without the need for discovery. The trial court concluded this was such a case. I see no clear abuse of discretion in that conclusion.

### JOE'S MOTION FOR SUMMARY JUDGMENT[4]

A defendant may prevail on summary judgment if he pleads and conclusively establishes each essential element of an affirmative defense. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832 (Tex. App.—Dallas 2000, no pet.). Joe's summary judgment motion asserted the affirmative defense of qualified official immunity. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994).[5] As a public official, Joe is immune from suit for the good faith performance of all discretionary duties within the scope of his au-

majority's conclusion that "evidence discovered during the continuance [could] raise fact issues on Joe's individual acts and his governmental immunity defense."

4. Because the majority determined the motion for continuance was incorrectly denied, it did not discuss the merits of Joe's motion for summary judgment.

5. Joe's motion does not clearly identify absolute legislative immunity as a ground of his motion. This Court cannot uphold a summary judgment on a theory that was not included within the party's motion.

thority. *Cook*, 17 S.W.3d at 460; *see also Chambers*, 883 S.W.2d at 653. 239 JV did not challenge the discretionary nature of Joe's conduct; it argued instead that material issues of fact on the remaining two elements—good faith and scope of authority—should prevent summary judgment. I disagree.

*Good Faith.*

In 1994, the Texas Supreme Court articulated a new test for "good faith" when it adopted the objective standard of the federal law of immunity. *Chambers*, 883 S.W.2d at 654. Now, the Texas test for whether an official acted in good faith is whether a reasonably prudent official, under the same or similar circumstances, could have believed that the official's actions were reasonable. *Id.; Cook*, 17 S.W.3d at 461; *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (noting that "if officers of reasonable competence could disagree on this issue, immunity should be recognized").

Joe's affidavit sets forth his actions as well as the background of the proposed moratorium. At the relevant time, the ratio of multi-to-single-family residences in Irving was twice as high as in other suburban cities. The Council voted overwhelmingly for the ordinance that limited multifamily development in response to significant concerns of Irving citizens. When the legality of extending the moratorium was raised, Joe performed legal research. In order to affirm that his vote on the ordinance was not in conflict with his status as a partner at J & G, Joe consulted with the Irving City Attorney.

These actions are tested by a standard of objective good faith; Joe's subjective knowledge or motivation is irrelevant. *Chambers*, 883 S.W.2d at 657; *Cook*, 17 S.W.3d at 461. The appropriate question, as 239 JV's summary judgment response conceded, was whether "a reasonable councilperson in Joe's position could have believed Joe's conduct involving the Moratorium was justified in light of clearly established law." It is undisputed that every other councilperson voted just as Joe did. The only reasonable inference that can be drawn is that *every* councilperson would have considered Joe's actions in advocating and voting for the moratorium reasonable.

239 JV claims that Joe misrepresented its client-attorney relationship with J & G, and the minutes of the June 22, 1995 meeting do reflect that Joe stated, "the firm does not in fact represent Two Thirty-Nine Joint Venture, never has." [6] 239 JV does not controvert the fact that J & G never represented it on zoning matters before the Irving City Council or any other body.[7] However, to the extent any misrepresentation concerning the scope of J & G's representation of 239 JV did occur, it took place after two of the three votes had been cast and nine months after the contract had been rejected. Any injury related to the lost contract would have long since occurred, and comments Joe made could not retroactively render his actions on the moratorium in bad faith.

---

**6.** In his deposition, Joe acknowledged that he "misspoke" on this subject and meant to say his firm had not represented 239JV before the City of Irving.

**7.** Indeed, in its Response to Defendant [J & G]'s Motion for Summary Judgment, 239 JV admits that J & G had "never filed suit on behalf of 239 JV regarding the Moratorium or formally appeared before the Irving City Council at a meeting or hearing on behalf of 239 JV."

Thus, the trial court did not err in deciding Joe's actions were taken in good faith, as a matter of law.

*Scope of Authority.*

239 JV also alleges that it raised material fact issues concerning whether Joe exceeded the scope of his authority in advocating and voting for the moratorium. A public official acts within the scope of his authority if he is discharging the duties generally assigned to him. *Chambers,* 883 S.W.2d at 658. The summary judgment evidence establishes that, in response to the saturation of multi-family housing in the City of Irving, Joe voted with the other council members to impose—and then to extend—a moratorium on multi-family housing development. As a City Council member, Joe's assigned duties certainly included casting votes in the best interests of the citizens of Irving, preparing as well as possible for each of those votes, and communicating with his constituents on issues of vital interest, including the legality of contemplated proposals. Advocating and voting on issues of significant concern to the community fall within the scope of authority of a city councilman.

239 JV argues that by performing research in J & G's law library, Joe somehow departed from his scope of authority as a councilperson and created an attorney-client relationship with the City of Irving. This argument ignores the plain duties of a councilman. Researching aspects of issues related to significant votes qualifies as responsible participation in the representative process. Indeed, the fact that expenses related to the legal research were invoiced and paid by the City of Irving as reimbursement for Joe's expenses related to his work as a council member evidences his authority to perform such research in that role.

239 JV also argues that Joe departed from the scope of his authority by sharing the results of his research with advocates of the moratorium, thus creating an attorney-client relationship with his constituents. Conclusory speculation and conjecture cannot defeat a party's right to summary judgment. *See, e.g., Brownlee v.. Brownlee,* 665 S.W.2d 111, 112 (Tex. 1984) (conclusions in an affidavit are insufficient to raise an issue of fact). Where summary judgment evidence raises no more than surmise or suspicion of a fact in issue, no genuine issue of fact exists to defeat summary judgment. *Wiggins v. Overstreet,* 962 S.W.2d 198, 200 (Tex. App—Houston [14th Dist] 1998, pet. denied); *Booth v. Cathey,* 893 S.W.2d 715, 720 (Tex.App.—Texarkana 1995), *rev'd on other grounds,* 900 S.W.2d 339 (1995).

The majority cites *Bagg v. University of Texas Medical Branch,* 726 S.W.2d 582 (Tex.App.—Houston [14th Dist] 1987, writ ref'd n.r.e.), to support its conclusion that the acts Joe took in his "individual capacity" would not be protected by governmental immunity. However, the unprotected "individual" acts discussed in *Bagg* are *unlawful* acts, such as trespass or eavesdropping on telephone conversations. *Id.* at 586. In an earlier case, the Texas Supreme Court stated, "[t]he question is not whether respondents (state officials) were acting on behalf of the State to accomplish a proper governmental purpose but whether the action they were about to take is *authorized by law.*" *Griffin v. Hawn,* 161 Tex. 422, 426, 341 S.W.2d 151, 153 (1960) (emphasis added). I perceive nothing unlawful in an elected official endeavoring to understand the potential consequences of his vote or communicating information to constituents.

In summary, Joe's acts described in 239 JV's original petition (providing leadership in favor of the moratorium, voting for the moratorium, and researching the legality of the moratorium) were acts Joe took in

his public role as councilman. Each was the act of a public official. Each was taken for the public good, not for some "individual" benefit. The summary judgment record contains no credible inference Joe engaged in "individual" acts related to 239 JV or the moratorium. Joe succinctly argues that it would be very difficult to imagine any activity more central to a legislator's role than these activities. I agree.

Because Joe has established his right to immunity as a matter of law, and 239 JV has identified no issue of material fact that would defeat that right, I would affirm the trial court's summary judgment in favor of Joe.

## Jenkens & Gilchrist's Motion for Summary Judgment

J & G's summary judgment motion is cast as both a traditional motion and a no-evidence motion. *See* Tex.R. Civ. P. 166a(c), (i). In its review of a summary judgment record, this Court must determine whether a disputed material fact issue exists that would preclude summary judgment. The ultimate question on appeal is whether the summary judgment proof establishes that the movant is entitled to summary judgment as a matter of law. *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex.1990). In a traditional motion, the movant must disprove, as a matter of law, one of the essential elements of each of the nonmovant's causes of action. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). In a no-evidence motion, the nonmovant must come forward with probative evidence suf-

ficient to raise a genuine issue of material fact on each of its claims. *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). In reviewing J & G's motion, we view the evidence in the light most favorable to 239 JV, and any doubts must be resolved in its favor. *Cate v. Dover Corp.*, 790 S.W.2d 559, 562 (Tex. 1990); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). Because the summary judgment in this case does not state the specific grounds on which it was granted, we must affirm the trial court's judgment if any one of the grounds asserted in J & G's motion are meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

## Malpractice

The heart of 239 JV's claim against J & G is legal malpractice, based upon breach of the firm's duty of loyalty to 239 JV.[8] The claim is premised upon two alleged violations: (1) failure by Joe to inform J & G of the council meeting of September 7, 1994 (the "Special Meeting"), and (2) failure by Joe and the firm to avoid any purported "conflict of interest" between J & G's ongoing representation of 239 JV and Joe's efforts, as a city councilman, in favor of the City of Irving moratorium. A legal malpractice claim requires proof of four elements: duty, breach, proximate cause, and resulting damages. *Peeler v. Hughes & Luce*, 868 S.W.2d 823, 827–28 (Tex.App.—Dallas 1993), *aff'd*, 909 S.W.2d 494 (1995). If J & G's summary judgment motion successfully disproved any one of those elements as a matter of law, then the

---

**8.** 239 JV's amended petition includes a single cause of action under the heading "Negligence/Gross Negligence and Breach of Fiduciary Duty and of Loyalty." The majority titles its analysis "Breach of Fiduciary Duty" but addresses the claims throughout as malpractice, employing the traditional elements of negligence. 239 JV conceded in its summary judgment response that "regardless of characterization [of its negligence and breach of fiduciary duty claims], the analysis would be the same under the particular facts of this case."

trial court's judgment must be affirmed. Likewise, if 239 JV failed to come forward with more than a scintilla of evidence of any one element, then the trial court's judgment must be affirmed. Analysis of just two elements suffices to confirm the trial court's ruling.

*Duty.*

In any malpractice case, the initial inquiry is whether the attorney owed a duty to his client under the circumstances of the case. The existence of a duty is a question of law for the court to decide based on the specific facts of the case. *Mitchell v. Mo.-Kan.-Tex.R.R.*, 786 S.W.2d 659, 662 (Tex. 1990); *Lampasas v. Spring Ctr., Inc.*, 988 S.W.2d 428, 433 (Tex.App.—Houston [14th Dist.] 1999, no pet.). 239 JV propounds two separate theories of duty. It argues that: (1) J & G owed a duty to inform it of the pending Special Meeting concerning the apartment moratorium, and (2) J & G owed it a duty to avoid and disclose the conflict of interest that developed because of Joe's participation in moratorium-related activities. The majority concludes these duties exist under Texas law and the facts of this case. I respectfully disagree.

(1) *Specific subject matter of legal representation.*

The existence of a duty to inform 239 JV of facts related to the pending Special Meeting is tied to the nature and scope of J & G's representation of 239 JV. Certainly J & G owed a fiduciary duty to 239 JV with respect to the specific matter on which the firm was retained to represent it. A lawyer has the fiduciary obligation "to disclose facts material to his representation." *McClung v. Johnson*, 620 S.W.2d 644, 647 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.) (citing *Rice v. Forestier*, 415 S.W.2d 711 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.)). The initial task, then, in addressing the duty issue, is to identify the specific subject matter of J & G's representation of 239 JV.

The majority describes the purpose and scope of J & G's representation of 239 JV with a broad brush. The majority states the representation extended from 1992 through 1996, and "[t]he purpose of J & G's representation was to provide legal assistance in selling the property for apartment development." The majority thus implies that 239 JV and J & G worked for some four years on a single issue: the sale of property for apartments. However, 239 JV's own pleadings and the summary judgment evidence lead to a different conclusion.

239 JV's pleadings describe the joint venture's purpose in more restrictive terms than those quoted above:

> 239 JV was organized through services provided by J & G in early 1992 with a singular business plan in mind: *acquire, develop and sell 239 certain acres* located in The Valley Ranch, a master planned community in Irving, Texas. Prior to acquiring the acreage, representatives of 239 JV confirmed with Irving city officials the permitted land uses on all 239 acres, *including two tracts designated for apartment development.*
>
> [Before this litigation] *239 JV was in the process of developing or had sold all such acreage with the sole exception of an apartment tract containing approximately 11 acres.*

Plaintiff's Second Amended Original Petition (emphasis added).

The summary judgment evidence provides the history of the two apartment-designated tracts: the first fourteen-acre tract was sold in August 1993; only this eleven-acre tract remained at the time of these proceedings. The remainder of the 239 acres were sold and developed with single-family residences.

The record contains a statement by one of 239 JV's principals that since 1992, "J & G has represented 239 JV in its formation and subsequent business dealings." However, the parties' summary judgment evidence has identified only two specific tasks that were undertaken by J & G on behalf of 239 JV and the Valley Ranch development before the moratorium vote. First, in 1992, J & G represented 239 JV in its formation. Second, on August 18, 1994, William Thau reviewed the contract for the sale of the eleven-acre apartment tract and gave comments on it to the 239 JV principals by telephone. Thus, according to appellant's pleadings and the relevant summary judgment evidence, the scope and purpose of J & G's representation close to the time of the September 7, 1994 city council meeting was limited to the review of an already-negotiated sales contract.

It may also be helpful to spell out what was *not* within the scope and purpose of J & G's representation of 239 JV. It is undisputed that, before the Irving City Council passed the moratorium, J & G had never been retained to represent 239 JV before the City of Irving in any capacity whatsoever, and particularly not in any zoning matter. It is similarly undisputed that, before the moratorium was enacted, 239 JV expressly elected to represent itself before the Irving City Council without assistance from legal counsel. The summary judgment evidence confirms this specific intent of 239 JV to represent itself. Joe's affidavit states that "Two Thirty Nine Joint Venture appeared before the City Council, through Mr. Jerry Ragsdale. Mr. Ragsdale stated that Two Thirty Nine Joint Venture chose not to do business with cities through attorneys, but to deal only through its principals." This statement is corroborated by representatives of 239 JV. Arthur Hewitt, a lawyer and 239 JV partner, stated the "best decision" made was to perform all of the work "before planning and zoning" and "before City Council internally" and not to refer it to the law firm of J & G; in fact, J & G never represented 239 JV before the City Council. Jerry Ragsdale, in a personal appearance before the City Council, emphasized 239 JV made it a practice to do business through its "principals" and not its attorneys.

In arguing a legal basis exists for imposition of a duty in this case, 239 JV cites cases addressing the duty to inform a client of matters specifically relating to the agreed-upon representation of an attorney. For example, 239 JV cites *Trinity Universal Ins. Co. v. Bleeker*, 944 S.W.2d 672, 679 (Tex.App.—Corpus Christi 1997) (regarding failure to communicate existence of settlement offer), *modified*, 966 S.W.2d 489 (Tex.1998), and *Matter of D.A.S.*, 951 S.W.2d 528, 530 (Tex.App.—Dallas 1997) (regarding attorney's failure in appeal from juvenile proceeding to inform client and his guardians of conclusion appeal would be frivolous and to recommend that appeal be dismissed), *mandamus granted on other grounds*, 973 S.W.2d 296 (1998). Each of these cases correctly discusses an attorney's duty to keep a client informed about an ongoing matter in which the attorney is representing the client. Neither these cases nor the facts of this case, however, impose a duty upon an attorney to inform a client of matters that are wholly separate and apart from any agreed-upon representation.

I cannot agree with the majority that J & G's representing 239 JV in reviewing a contract for sale of property to an apartment developer significantly alters and expands the area of responsibility of both J & G and Joe, the lawyer-legislator, beyond the parameters originally contemplated or agreed to by the parties. In this case, the majority holds J & G accountable to 239 JV for zoning matters, including notifica-

tion of the city council's meeting agenda. I reject the majority's enlargement of the lawyer-legislator's duties and responsibilities. If a firm's limited responsibilities do not include zoning issues or monitoring the proceedings of a city council, these responsibilities cannot be created inferentially because the firm worked on a contract for sale of the land. In the case before us, J & G had no such responsibilities; these responsibilities had been expressly retained by the principals of 239 JV.

### (2) Alleged conflict of interest.

239 JV identifies its second purported duty as an obligation on the part of Joe and J & G to avoid any purported "conflict of interest" between J & G's ongoing representation of 239 JV and Joe's efforts, as a city councilman, in favor of the City of Irving moratorium. Within that obligation to avoid conflicts, 239 JV demands that J & G deal appropriately with "ongoing actions and failures to act regarding [its] representation of [JV] with regard to the Moratorium." The briefs, the pleadings, and the majority's opinion fail to crystalize the precise circumstances of the so-called "conflict" with any specificity, and the majority uses no consistent language to describe the conflict it attributes to Joe.[9] Simply put, it appears 239 JV and the majority see a conflict of interest in the fact that:

> Joe, as a member of the Irving City Council, would or could take positions that would affect the real estate transactions in which J & G represented 239 JV.

Majority Op. at 1, at 900.

239 JV's summary judgment response cited absolutely no legal authority for the imposition of this second duty. The majority endeavors to cure this lapse by citing to various current and former rules of professional conduct. But as the majority concedes, the preamble to the Texas Disciplinary Rules of Professional Conduct specifically states that the rules are *not* to be used to define standards of civil liability:

> These rules do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached. Likewise, these rules are not designed to be standards for procedural decisions. Furthermore, the purpose of these rules can be abused when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

TEX. DISCIPLINARY R. PROF'L CONDUCT preamble ¶ 15. Courts that have addressed the issue have taken the preamble's directive seriously. *See, e.g., Judwin Props., Inc. v. Griggs & Harrison, P.C.,* 981 S.W.2d 868, 870 (Tex.App.—Houston [1st Dist.] 1998), *pet. denied per curiam,* 11 S.W.3d 188 (Tex.2000) (State Bar Rules not enforceable through client's negligence

---

9. For example, the majority refers at different times to Joe's conflicts with 239 JV concerning "the impending vote on the moratorium," and "his actual vote [on the moratorium]," as well as Joe's "fiduciary or other legal obligation to a non-client" and his "personal or civic interest and the interests of a client."

claim); *Adams v. Reagan*, 791 S.W.2d 284, 291 (Tex.App.—Fort Worth 1990, no writ) (client's charge of conflict of interest should be raised in disciplinary proceeding). The disciplinary rules set forth the proper conduct of lawyers "solely for purpose of discipline within the profession." 1 J. Hadley Edgar, Jr. & James B. Sales, *Texas Torts and Remedies* § 12.02[1][a][ii][A] (2000). Thus, no private cause of action exists for violation of the rules, and the rules "do not define the standard for a lawyer's civil liability for professional conduct." *Id.* It is clear the disciplinary rules cannot provide the requisite duty element of a malpractice claim by a client. Nevertheless, the majority relies on these rules alone to "evidence" an existing duty of care. At the outset, I am troubled by this use of the supreme court's rules in a manner that violates the clear dictates of the rules themselves.

However, even if the rules were appropriately part of our duty inquiry, the majority's position would not be persuasive. Indeed, despite the number of ethical provisions discussed in its opinion, the majority does not identify a rule that was violated by Joe or J & G. The majority addresses at least five ethical rules or sections of the Restatement (Third) of the Law Governing Lawyers (the "Restatement"): (1) Restatement § 135 and its comment f(i); (2) the former DR 8-101(A)(1); (3) Model Rule 1.11(c); (4) Texas Disciplinary Rule 1.06(b)(2) and comment 13; and (5) Texas Disciplinary Rule 1.13(a) (although it dismisses comment 3 to this provision as irrelevant). However, in each discussion the majority is forced to concede that the provision it addresses does not really speak to the conflict or duty posited in this case.

The majority's inability to identify an applicable conflict rule should not be surprising. An ethical "conflict"—or any breach of a duty of loyalty—suggests that a lawyer has divided his allegiance between two or more parties, to one's detriment. There is simply no evidence of Joe's being so conflicted. There is no summary judgment evidence Joe represented the City of Irving or some citizens' group.[10] Nor is there any summary judgment evidence of self-interest on Joe's part that could serve as the source of a conflict. Joe did no more and no less than any lawyer-legislator does: he made decisions on policy issues based on his view of the best interests of the people he represented. No disciplinary rule prohibits such conduct; no disciplinary rule brands such conduct as a "conflict" because the policy at issue ultimately is adverse to a client's economic interests.

239 JV and the majority do not address the single rule that discusses obligations related to public service. Rule 1.10 imposes constraints on a lawyer who is employed in the public sector and subsequently moves to the private sector. The primary thrust of the rule is protecting confidential government information, which I realize is not at issue in this case. However, in addressing mechanisms for screening a lawyer from a matter in which he might possess such confidential government information, the rule does define the concept of a "matter" within the public realm. That definition is helpful in our effort to identify the limits of J & G's representation of 239 JV:

> As used in this rule, the term "matter" does not include regulation-mak-

---

10. 239 JV did try to raise this argument in its response to Joe's summary judgment motion; it offered no more than rank speculation at that time. It offered absolutely no summary judgment evidence in response to J & G's motion that tended to show Joe acted as counsel for the City of Irving or any citizens' group.

ing or rule-making proceedings or assignments, but includes:

(1) Any adjudicatory proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge accusation, arrest or other similar, particular transaction involving a specific party or parties; and

(2) any other action or transaction covered by the conflict of interest rules of the appropriate government agency.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.10(f). The rule teaches that even when a lawyer has been employed by a government office (which Joe was not), he would not be conflicted out of a subsequent matter for a private client if the matter overlapped only with the lawyer's past participation in "regulation-making or rule-making proceedings." The clear implication is that participation in broad-based public activities that are legislative in nature will not provide a source of conflict under the rules. The quasi-legislative proceedings identified in rule 1.10 are analogous to the policy-making efforts of the Irving City Council in enacting a moratorium on multi-family construction. If participation in such a process would not be a source of conflict for the government employee turned private practitioner, it should not, under the particular facts of this case, be a source of conflict for Joe and, derivatively, for J & G.

In the end, the majority has not identified any ethical rule or provision that describes a conflict of interest created by a lawyer-legislator's advocating or voting for a public policy that ultimately may, in its application, be adverse to a client's interests. Nor has the majority identified any legal precedent supporting the existence of its conflict-based "duty to disclose" under the facts of this case, whether "evidenced"

by the disciplinary rules or otherwise. As to the imposition of civil liability for the non-communication of this "conflict," the majority relies upon the Restatement, a law review Note, a book titled *The Law of Lawyering* by Messrs. Hazard and Hodes, and a Houston appellate decision concerning fee forfeiture when an attorney settles a case without consent from his clients. No statute is cited. No Texas Supreme Court case—or relevant case from this Court or one of our sister courts—is cited. The absence of persuasive authority supporting imposition of civil liability in this circumstance troubles me greatly.

The likely effects of imposition of this "rule-based" liability concern me as well. The majority creates a significantly broader duty, ostensibly based upon these professional rules, than even 239 JV envisioned. After today, the lawyer-legislator faces potential liability for taking a position on any broad-based issue that could negatively affect a client. According to the majority, the immunity that clothes public-interest decision making by every other officeholder may no longer protect a lawyer if any client can identify a repercussion from a decision (or the mere advocacy of a decision) of which the lawyer-officeholder did not personally notify him. For example, a lawyer-legislator may now face civil liability any time he takes a position "adverse" to a client who happens to be a homeowner affected by a vote on public services. He may be liable to a client who happens to be a taxpayer affected by a vote on tax rates. Even on the smallest scale, the ramifications of this exposure may be compelling: will a lawyer-legislator be doomed to defend a docket of cases concerning his vote to increase all residents' monthly sanitation fee? or his vote to repave city streets on one side of town before the side on which his

client's businesses are located? The majority presumes such votes by a lawyer-legislator represent conflicts of interest, and it orders them disclosed or the lawyer-legislator will face civil liability. Unlike the majority, I see the lawyer-legislator as serving the public interest with his or her votes, not the interests of one client that are somehow in conflict with the interests of another client.

The record indicates that each of Joe's votes dealt with an ordinance with general applicability to the City of Irving. Neither the ordinance nor Joe's vote targeted a specifically identified individual or entity.[11] Instead, Joe advocated against apartment development generally, his position applicable to landowners and developers alike throughout the City. His position was "policy" oriented, involving an abstract ordinance which lacked a specific, identifiable transaction or party. It is undisputed that Joe's advocacy was based upon his understanding of what was best for the City. All individuals and entities—regardless of whom they employ as attorneys—are subject to existing law and all changes in the law. The fact that the law changes in a way that may adversely affect an entity does not mean that the entity has a claim against one of the legislators who happened to be its attorney in another context.

In the end, the majority has unduly enlarged the scope of J & G's legal representation beyond the parties' intentions and has created a duty and a concomitant liability predicated entirely upon a perceived breach of ethical obligations that may ultimately dampen the public spirit of and impede public service by lawyers. This judicial expansion of duty, and thus liability, a particularly giant step in our jurisprudence, should be the responsibility and undertaking of our Texas Legislature or the Texas Supreme Court, not an intermediate court. I would conclude, as a matter of law, that 239 JV failed to demonstrate any claim grounded upon an existing legal duty owed to it by J & G.

*Proximate Cause.*

In addition, 239 JV failed to come forward with even a scintilla of evidence that Joe's or J & G's conduct was the proximate cause of any injury to their client. Although proximate cause in a legal malpractice case is usually a question of fact, it may be determined as a matter of law if the circumstances are such that reasonable minds could not arrive at a different conclusion. *Mackie v. McKenzie*, 900 S.W.2d 445, 449 (Tex.App.—Texarkana 1995, writ denied) (citing *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 105 (Tex.1977)). The two elements of proximate cause are cause-in-fact and foreseeability.[12] *Nixon*, 690 S.W.2d at 549.

Conduct is the cause-in-fact of harm to another if, in a natural and continuous sequence, the conduct produces an event, and without the conduct such event would not have occurred. *Lear Siegler*, 819 S.W.2d at 471. To qualify as the cause-in-

---

11. The only decision before the Council that specifically involved a J & G client was 239 JV's later attempt to gain an exemption from the moratorium; Joe abstained from that vote.

12. The majority states that "there is no dispute about foreseeability." Because the issue of foreseeability was not adequately raised in J & G's summary judgment motion, I do not address it here. Nonetheless, I would not want to give the impression that I believe that it was somehow foreseeable to Joe or J & G that (a) not informing a client-landowner of a publicly-noticed meeting, or (b) not communicating to a client-landowner that among the city council members unanimously in favor of the moratorium there was a J & G partner, could have caused 239 JV to lose its sales contract. I do, in fact, dispute that belief.

fact, the defendant's act must have been a substantial factor in bringing about the injury alleged. *Doe v. Boys' Club of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). "Cause-in-fact is not shown if the defendant's negligence did no more than furnish a condition which made the injury possible." *Id.*

The majority does not identify any evidence of cause-in-fact related to the breach of a duty concerning communication of the purported conflict of interest. I am unable to discern how the alleged "conflict of interest" could have caused 239 JV's injuries. It is undisputed that the September 7, 1994 vote on the original moratorium passed unanimously (8–0), and, subsequently, every vote to extend the moratorium passed by an overwhelming margin (8–0 or 8–1). Therefore, the moratorium would have passed if Joe had abstained from voting or if he had repeatedly voted against it. In either event, the contract 239 JV had on its eleven acres of land would have suffered the same fate. Despite the majority's assertion to the contrary, nothing in the record indicates that—had Joe told either 239 JV or J & G that he was supporting the moratorium—239 JV could have avoided economic harm. Joe's vote was simply not necessary to the passage of the moratorium, and 239 JV has presented only conjecture, not evidence, that Joe's advocacy influenced any other councilperson's vote.[13] This failure to identify a fact issue as to causation related to the purported conflict disclosure duty is fatal to 239 JV's claim under that duty.

Under its "duty to inform" theory, the majority posits the issue as whether the lawyer's failure to disclose material facts proximately caused 239 JV's injury. The real issue before us is whether the lawyer-legislator's non-communication[14] to 239 JV of the Special Meeting date and proposed agenda proximately caused 239 JV's injury. A number of factors persuade me this issue should be decided against 239 JV.

First, and perhaps most importantly, the information at issue was already public knowledge as a result of the City's posted notice. 239 JV offered no evidence that the City's notice of its Special Meeting was defective in any way. The record appears to establish its adequacy under the Texas Open Meetings Act. *See* TEX. GOV'T CODE ANN., § 551.043 (Vernon 1993) ("notice of a meeting of a governmental body must be posted in a place readily accessible to the general public for at least 72 hours before the scheduled time of the meeting"). Thus, 239 JV's comparison of this situation with other cases in which attorneys had duties to disclose information to their clients is not persuasive. In those cases, the information at issue was of a private or confidential nature; the attorney was the only person who could inform the client of some fact that was of consequence to the client's representation. The information at issue in this case—the time and agenda for a city council meeting—was public, not private or confidential.[15] It involved a public meeting of a public entity about which public notice had been given. This scheduling information was in the public

---

13. Indeed, the summary judgment record contains evidence from a number of Irving City Council meetings indicating that other votes related to zoning issues championed by Joe failed to garner even a majority.

14. Although "non-communication" and "failure to communicate" may be used interchangeably in many contexts, in this instance the latter terminology includes the notion that

the lawyer has a duty to communicate the information and breaches the duty by failing to do so. I see no such duty and, therefore, use the former terminology.

15. 239 JV concedes in its amended petition that the information was not confidential or privileged.

realm, was available to the public, and could have been known to anyone interested in City issues.

In addition, 239 JV's sole claim is that J & G did not convey this information; *it never asserts that it did not know this information.* Through the City of Irving's compliance with the Open Meetings Act, 239 JV received the same notice of the Special Meeting that all members of the interested public received. *See City of San Antonio v. Fourth Court of Appeals,* 820 S.W.2d 762, 765 (Tex.1991) (intended beneficiaries of Act's notice requirement are "members of the interested public"); *Stockdale v. Meno,* 867 S.W.2d 123, 124–25 (Tex.App.—Austin 1993, writ denied) (intent of the Act is to safeguard public's interest in knowing workings of governmental bodies; intended beneficiaries are "members of the interested public"). Certainly 239 JV's own evidence indicates that other members of the interested public had notice of the meeting: 239 JV's purchaser clearly knew of the meeting because it canceled the contract the very same day; and at least one other developer, JPI, was able to have its land "platted" and "grandfathered" before the meeting.

In fact, 239 JV asserts, and the majority apparently agrees, that had Joe or J & G informed it of the Special Meeting, 239 JV could have quickly "platted" its own tract, as JPI had done, so as to be "grandfathered" under the City's former ordinances. But 239 JV offers no summary judgment evidence explaining why J & G

was unable to act on the City's public notice as JPI had done.[16] 239 JV could not have been relying upon Joe to monitor council proceedings and inform it of any significant developments on this issue. 239 JV specifically assumed the task of monitoring zoning proceedings at the Council. 239 JV had the same opportunity for notice of the meeting that these other entities had. We should not tolerate or reward efforts by 239 JV to shift this responsibility to J & G and thus distance itself from the consequences of its actions and, at the same time, seek compensation by laying fault at the feet of Joe or J & G.[17]

239 JV's response and briefs before this Court cite *no* summary judgment evidence stating it did not know about the meeting, only that Joe and J & G did not inform it about the meeting. This Court is asked to infer 239 JV did not know in advance of this public meeting. However, only reasonable inferences can be drawn in favor of the summary judgment nonmovant. *Nixon,* 690 S.W.2d at 548–49. Given the summary judgment record concerning the City's public notice, the knowledge of other interested parties, and 239 JV's consistent practice to represent itself before the city council and to monitor its own activities, it would not be reasonable to infer that 239 JV had no knowledge of the meeting. In the absence of summary judgment evidence from the non-movant, I decline to draw that inference.[18]

---

**16.** JPI acted, it must be remembered, on the public notice of the meeting, not on information as to how a particular member of the city council may vote.

**17.** As previously noted, the record indicates that 239 JV had decided to represent itself in municipal zoning appearances. 239 JV principal Art Hewitt admitted that J & G had never represented 239 JV before the Irving City Council. Moreover, 239 JV's pleadings

have always admitted it handled zoning matters on its own. *See* Plaintiff's Original Petition ("Prior to acquiring the [Valley Ranch] acreage, representatives of 239 JV confirmed with Irving city officials the permitted land uses on all 239 acres, including two tracts designated for apartment development.").

**18.** Although 239 JV, as the nonmovant, had no burden to establish its lack of knowledge definitively, it was required to come forth

Still another factor militating against 239 JV's position is the nature of the public information involved here. The information merely informed the public that a public hearing would be conducted by the city council on a certain date relative to two described items.[19] By its nature, such advance notice could not relay the outcome of the meeting. And even if Joe had conveyed his own intention to support the moratorium at the Special Meeting, that fact would not give any definitive indication of the outcome of any vote that might ultimately be taken at the meeting. Joe was only one councilperson among eight.

Nonetheless, 239 JV argues it should have been told of Joe's position on the moratorium so that it could have made its own decisions concerning the "grandfathering" process. But 239 JV's own evidence establishes JPI succeeded in that grandfathering process based upon public information alone: there is no summary judgment evidence JPI had knowledge of how Joe or any other councilperson planned to vote. Thus, the public notification by the City must have been sufficient to avoid the moratorium, if a landowner chose to do so. Joe's non-communication of his position on the moratorium could not have caused 239 JV's injuries.

The ultimate council vote set a new policy for the City of Irving. It did not identify or specifically target 239 JV; rather, its actions constituted a policy decision directed at certain construction activities within the City of Irving. Under these circum-

stances, the summary judgment record establishes that Joe's notification *vel non* of the meeting date and agenda, information already publicly disseminated, could not have been the legal cause of any of 239 JV's injuries. In the end, I must conclude that J & G's "act or omission was [not] a substantial factor in bringing about injury" to 239 JV. *See Doe,* 907 S.W.2d at 477; *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995); *Rodriguez v. Klein,* 960 S.W.2d 179, 184 (Tex.App.—Corpus Christi 1997, no pet.).

The burden was on 239 JV to come forward with some evidence of each essential element of its claim. TEX.R. CIV. P. 166a(i). It was required to point to specific summary judgment evidence that would raise a genuine issue of material fact on the element of causation; this Court is not required to search the record to determine if such an issue could exist. *See Rolen v. Burroughs Wellcome Co.,* 856 S.W.2d 607, 608 (Tex.App.—Waco 1993, writ denied) (citing *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 677 (Tex. 1979)). 239 JV presented no evidence supporting cause-in-fact. The trial court correctly granted J & G's motion for summary judgment. *Lampasas,* 988 S.W.2d at 436.

### Immunity

J & G asserts that it was entitled to summary judgment based upon Joe's im-

---

with evidence sufficient to raise a fact issue on each ground of the no-evidence summary judgment motion. *See* TEX.R. CIV. P. 166a(i). I am particularly reluctant to draw such an inference given the ease with which 239 JV could have raised a fact issue concerning its lack of knowledge.

**19.** The posted notice announced a "public hearing" concerning the following agenda items:

1 Report of Comprehensive Plan Consultants J.T. Dunkin & Associates and Freilich, Morgan, Leitner and Carlisle—Strategic Issues

2 ORDINANCE—Adopting Limitations On Acceptance and Processing of New Applications for Establishment of Multi Family Land Uses for a Period of Time Not To Exceed 120 Days

munity defenses.[20] When a defendant moves for summary judgment based upon an affirmative defense, it must conclusively establish each essential element of that defense. *General Mills Rests.*, 12 S.W.3d at 832.

It is undisputed that 239 JV's claims against the firm are rooted exclusively in the conduct of Joe. Indeed, in its response to J & G's summary judgment motion, 239 JV describes its claims against J & G as "based upon Joe's activities and duties owed to 239 JV as a lawyer of J & G," and it avers that "Joe need not be a party to this suit in order for J & G to be liable in this case based upon Joe's actions or failures to act in his capacity as a lawyer and shareholder of J & G." To establish the firm's liability for Joe's conduct, the majority refers to a series of cases stating the settled principles of vicarious liability based upon agency and partnership relationships. *See* Majority Op. at 11–12. The majority does not address the corresponding *defensive* effect of vicarious liability: to the extent 239 JV's claims against the firm are based on liability for Joe's conduct, those claims are defeated by any legal defense of Joe's conduct. *See, e.g., DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex.1995) (a private employer "is entitled to assert any affirmative defense its employee has to liability"). In this case, Joe's defense of immunity inures to the benefit of J & G as well.[21]

To take advantage of Joe's immunity, J & G must have established that each act of which 239 JV complains falls within either his qualified immunity or his legislative immunity.[22] I have addressed Joe's qualified immunity at length in the preceding discussion concerning Joe's motion for summary judgment. The same reasoning applies here, and the same result follows.

Legislative immunity protects "functionally legislative" acts. *See Bowles v. Clipp*, 920 S.W.2d 752, 758 (Tex.App.—Dallas 1996, writ denied). To discern which acts qualify as "legislative" acts, "courts have consistently recognized a distinction between the legislative act of establishing a policy, act, or law and the nonlegislative act of enforcing or administering that policy, act, or law." *Id.* The majority does not dispute that advocating for the moratorium (whether by providing leadership or research in its support) and voting for the moratorium are acts of establishing policy. Thus, any J & G liability that flows from Joe's advocacy and voting for the moratorium policy is barred vicariously by Joe's legislative immunity.

However, the majority opines that neither qualified nor legislative immunity will protect J & G from liability for J & G's "continued representation without disclosure of the conflict with 239 JV's interests." Majority Op. at 22. 239 JV's theories concerning Joe's non-communication were added in its amended petitions, after

**20.** Joe's pleading asserts the affirmative defense of immunity broadly. Although we have determined that Joe did not move for summary judgment based on legislative immunity, his pleading could have supported such a motion as well as the one he did file based upon official or qualified immunity. J & G's Second Amended Answer specifically pleads the bar of Joe's "legislative and/or official immunity" insofar as 239 JV's claims against J & G are based on liability derived from the conduct of Joe.

**21.** J & G is not itself immune from suit, as the City of Irving would be for the acts of its council members. Instead, J & G can assert defensively Joe's lack of liability to 239 JV in this suit. In other words, because 239 JV sues J & G only for Joe's conduct, if Joe's conduct is found blameless, then J & G is not liable to 239 JV.

**22.** Although Joe did not raise legislative immunity as a ground for his summary judgment motion, J & G did raise that theory in its own motion.

Joe was granted summary judgment based on qualified immunity. However, although 239 JV did not specifically complain in its original petition concerning Joe's non-communication about his "positions" on the pending moratorium, these allegations really contain no new facts: the original petition pleaded that Joe was a member of the Irving City Council, that he voted in favor of the moratorium all three times, and that the principals of 239 JV "had never heard of Joe, nor were they aware that he was a partner in J & G." Thus, it was certainly implicit from the outset of this suit that Joe had not communicated—directly or through the firm—to 239 JV concerning the meeting, the moratorium or his "position" on it.[23]

The majority asserts that this non-communication involved "not official acts but acts of an attorney." *Id.* In doing so, the majority is merely echoing 239 JV's efforts to attach a new theory of liability to the same conduct by Joe. With that new label, the majority asserts, Joe's vote for the moratorium has been transformed into "evidence of the conflict with the client's interest, not the basis of liability." *Id.* But it does not matter if the label placed upon Joe's conduct has changed; his conduct has not changed, and it is conduct that is at issue in decisions of immunity. Joe acted as a city councilman in advocating and voting for a city policy. In that role, he considered the best interests of the City and acted on those interests. Joe's conduct should be protected by legislative immunity, regardless of the legal theory 239 JV urges.

By deciding otherwise, the majority has—in effect—allowed its new "duty to inform [about the Special Meeting and its agenda]" and "duty to disclose [the purported conflict of interest]" to trump the principle of immunity. But this Court has subscribed to the understanding that if an official's conduct was legislative in nature—as Joe's was—then he is entitled to absolute immunity. *See Bartlett v. Cinemark USA, Inc.,* 908 S.W.2d 229, 234 (Tex. App.—Dallas 1995, no writ). The majority cannot, on its own, deprive J & G of its affirmative defense of "absolute" immunity simply by changing the label on the plaintiff's claim. By doing so, the majority elevates pure form over substance. Joe's conduct was entitled to immunity, and because J & G's liability is predicated upon Joe's conduct, J & G was entitled to summary judgment on this ground as well.

For all the reasons discussed herein, I would affirm the trial court's judgment.

---

23. I have discussed above my position that Joe had no duty to communicate to 239 JV about the Special Meeting. In terms of J & G's affirmative defense of immunity, however, the issue should probably be examined in terms of whether Joe's non-communication was the reasonable act of a city councilman. Individual council members are not charged with communicating the schedule or agenda for a meeting to the public. The City is charged with giving that notice under the Open Meetings Act. Joe was acting as a reasonable council member in relying upon the City to give appropriate public notice of a public meeting.